Reuben J. KATZ, on behalf of himself and all others similarly situated,

v.

CARTE BLANCHE CORPORATION, Appellant.

No. 72–1054.

United States Court of Appeals, Third Circuit.

Argued Feb. 1, 1973.

Reargued en banc Nov. 15, 1973.

Decided March 15, 1974.

As Amended April 9, 1974.

See also 52 F.R.D. 510.

Cloyd R. Mellott, John H. Morgan, Robert W. Doty, James S. Curtin, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for appellant.

Roslyn M. Litman, Howard A. Specter, David R. Brown, Litman, Litman, Harris & Specter, Pittsburgh, Pa., for appellee.

Argued Feb. 1, 1973

Before SEITZ, Chief Judge, ALDISERT, Circuit Judge and FISHER, District Judge.

Reargued Nov. 15, 1973.

Before SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This appeal is before us pursuant to the Interlocutory Appeals Act of 1958, 28 U.S.C. § 1292(b). The appellant Carte Blanche Corporation (Carte Blanche) seeks review of an order of the district court which granted the pretrial motion of the plaintiff Katz that his suit be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure and directed that notice be sent to the alleged members of the class.

Carte Blanche is a national credit card company. Its members pay an annual membership fee of $15.00 which gives them the privilege of charging items at the company's associated establishments. Carte Blanche purchases the charge slips from the associated establishments at a discount, and invoices the members for the face amount. Katz, who after intervening was substituted for a previously named plaintiff, Stept, seeks statutory damages and costs of suit, including a reasonable attorneys fee, for Carte Blanche's alleged failure to make pretransaction and transaction disclosures regarding the computation of finance charges to its members in violation of the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601–1681t. The three allegedly improperly disclosed finance charges are:

(1) The $15 annual membership charge;[1]

(2) The late charge assessed on overdue unpaid balances;[2] and

(3) The finance charge on an extended payment plan for purchase of airline tickets.

TILA's disclosure provisions apply only to extensions of consumer credit. Thus persons using a Carte Blanche credit card for business are not protected by the Act from the allegedly inadequate disclosures. Katz claims to be a nonbusiness card user, and to represent all other

---

[1] The Federal Reserve Board interpretation of TILA is that the annual fee for membership in a credit plan is not a finance charge because it is imposed as a qualification of membership in the plan and for issuance of the card, and not as an incident of or condition of any specific extension of credit. 12 C.F.R. § 226.407. Katz disputes this Federal Reserve Board interpretation. *But see* note 6 *infra.*

[2] The Federal Reserve Board interpretation of TILA is that a "late payment, delinquency, default, reinstatement, or other such charge is not a finance charge if imposed for actual unanticipated late payment, delinquency, default or other such occurrence." 12 C.F.R. § 226.4(c). Katz claims that the late charges are in fact finance charges for which disclosure is required. *See* 15 U.S.C. § 1605(a); 12 C.F.R. § 226.401.

such users. He seeks recovery pursuant to 15 U.S.C.A. § 1640(a):

"Except as otherwise provided in this section, any creditor who fails in connection with any consumer credit transaction to disclose to any person any information required under this part to be disclosed to that person is liable to that person in an amount equal to the sum of

(1) twice the amount of the finance charge in connection with the transaction, except that the liability under this paragraph shall not be less than $100 nor greater than $1000; and

(2) in the case of any successful action to enforce the foregoing liability, the costs of the action together with a reasonable attorney's fee as determined by the court."

Katz, or any other card holder, in order to establish Carte Blanche's liability under § 1640(a), must show: (1) that a given charge was a finance charge within the meaning of TILA; (2) that the disclosure with respect to that charge was not in compliance with the applicable TILA regulations; and (3) that the charge was imposed in connection with a consumer credit transaction, not a business transaction. The first two showings focus on the uniform conduct of Carte Blanche. The third showing focuses on the separate conduct, and possibly the subjective intention, of each Carte Blanche member. In the district court Katz moved for a determination that the case proceed as a class action in which he represented a class consisting of all Carte Blanche credit card holders, since all such holders had been charged the $15 annual membership fee, and such a class would include all who had been assessed an overdue payment charge or an extended payment airline ticket charge. That class would include somewhere between 717,000 and 800,000 members. If Katz succeeded in establishing liability to every class member for the minimum recovery specified in § 1640 (a)(1) the liability would be substantially in excess of Carte Blanche's net worth. The record does not establish how many would be included in a class restricted to members who had been assessed late charges since the effective date of TILA. Nor does it establish the number of persons who have paid extended payment charges for airline tickets, although Katz estimates this number at 40,000.

The district court first considered whether Katz' complaint satisfied the prerequisites of Fed.R.Civ.P. 23(a). The court readily concluded that the class was too numerous for joinder of all members, that there were questions of law or fact common to the class, and that Katz would fairly and adequately represent the class. Thus three of the prerequisites of rule 23(a) were satisfied. In examining the fourth prerequisite, "the claims . . . of the representative parties are typical of the claims . . . of the class," Fed.R.Civ.P. 23(a)(3), the court was aware that each class member in order to recover would have to show that the transaction on which he based his claim was a consumer and not a business transaction. But concluding that Katz' claims were coincident and not in conflict with those of the class, it found this requirement was satisfied as well. The district court had doubts, initially, that it could make the findings required by rule 23(b)(3) that questions of law or fact common to the class predominate over questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. See Katz v. Carte Blanche Corp., 52 F.R.D. 510 (W.D.Pa.1971). After further briefing and argument, however, the district court, over Carte Blanche's strenuous objection, overcame its doubts and entered an order (1) granting Katz' motion that the action proceed as a class action on behalf of all authorized holders of one of Carte Blanche's credit cards since July 1, 1969, the effective date of TILA, and (2) directing that a notice of the pendency of the action be sent to

each class member, the initial cost, estimated at $37,500, to be borne by Katz. *See* Katz v. Carte Blanche Corp., 53 F. R.D. 539 (W.D.Pa.1971). The form of notice is reproduced at 53 F.R.D. 547. The district court simultaneously certified that the order involves a controlling question of law as to which there is a substantial ground for a difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation. A panel of this court permitted an appeal to be taken.

*Appealability of Rule 23(b)(3) Orders*

We are met at the outset with the contention that the appeal should be dismissed because permission to appeal pursuant to 28 U.S.C. § 1292(b) was improvidently granted, in that an appeal under that section is not appropriate to review a district court's favorable class action determination under rule 23(a) and 23(b)(3). That contention is based upon a misapprehension of the intended purpose of the Interlocutory Appeals Act and a misunderstanding of the role of the district court judge in granting or denying leave to proceed as a class action under rule 23(b)(3).

 A class action determination, affirmative or negative, is not in this circuit a final order appealable under 28 U.S.C. § 1291. Hackett v. General Host Corp., 455 F.2d 618 (3d Cir.), cert. denied, 407 U.S. 925, 92 S.Ct. 2460, 32 L. Ed.2d 812 (1972). *Compare id. with* Eisen v. Carlisle & Jacquelin, 370 F.2d 119 (2d Cir. 1966), cert. denied, 386 U.S. 1035, 87 S.Ct. 1487, 18 L.Ed.2d 598 (1967). If a district court denies class action treatment, even on discretionary grounds, and certifies, pursuant to rule 54(b), that the order dismissing the complaint against the absent class members is a final judgment, such an order is appealable. *See* Hayes v. Sealtest Foods Division of National Dairy Products Corp., 396 F.2d 448 (3d Cir. 1968). But rule 54(b) does not provide a means for reviewing the grant of class action treatment. If the court in entering a class action order acts outside its jurisdiction, Shutte v. Armco Steel Corp., 431 F.2d 22 (3d Cir. 1970), cert. denied, 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808 (1971), or in disregard of appropriate procedural safeguards, Swindell-Dressler Corp. v. Dumbauld, 308 F.2d 267 (3d Cir. 1962), the order may be reviewable by mandamus. But if the court has acted within its jurisdiction pursuant to appropriate procedural safeguards and in a nonarbitrary manner, mandamus will not lie. Solomon v. Continental American Life Insurance Co., 472 F.2d 1043, 1046 (3d Cir. 1973); Hackett v. General Host Corp., *supra*, 455 F.2d at 626; Weight Watchers of Philadelphia, Inc. v. Weight Watchers International, Inc., 455 F.2d 770, 775 (2d Cir. 1972); Interpace Corp. v. City of Philadelphia, 438 F.2d 401, 404 (3d Cir. 1971). Thus if there is any route open for the interlocutory review of the grant of class action treatment under rule 23(b)(3) in *this circuit, it is only pursuant to 28 U.S.C. § 1292(b).*

We have, in Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727, 734 (3d Cir. 1970), *cert. denied,* 401 U.S. 974, 91 Ct. 1190, 28 L.Ed.2d 323 (1971), in an appeal pursuant to § 1292(b), reviewed and reversed the grant of class action treatment. *See also* Wilcox v. Commerce Bank of Kansas City, 474 F.2d 336 (10th Cir. 1973), Zahn v. International Paper Co., 469 F.2d 1033 (2d Cir. 1972), aff'd, 414 U.S. 291, 94 S.Ct. 505, 38 L. Ed.2d 511 (1973), and Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122 (5th Cir. 1969), affirming the denial of class action motions on § 1292 appeal. Obviously, then, some class action determinations are reviewable under § 1292(b).

Both Kauffman v. Dreyfus Fund, Inc. and Zahn v. International Paper Co. are arguably distinguishable from this case, however, since both involved nondiscretionary reasons for rejecting class action treatment. In *Kauffman* the plaintiff, not being a member of the class, could not be a class representative. *See* 434 F.2d at 734. In *Zahn* the issue was

whether each of the class members had to meet the jurisdictional amount requirement to bring his claim within the district court's subject matter jurisdiction. The contention against appealability in this case is that because the district court's decision allowing the case to proceed as a class action in contrast with *Kauffman* and *Zahn* involved the exercise of discretion, an appeal under § 1292(b) should not lie. Two circuit courts have in § 1292(b) appeals reviewed those aspects of a district court's class action determination which involve some exercise of discretion. Wilcox v. Commerce Bank of Kansas City, *supra*; Johnson v. Georgia Highway Express, Inc., *supra*. In fact in *Wilcox*, without discussing the appropriateness of its review, the Eighth Circuit examined one of the issues before us, the superiority of a rule 23(b)(3) class action for adjudication of a TILA claim. It found that the district court acted within its sound discretion in denying the motion.

The source of the contention that discretionary aspects of a rule 23 determination are not reviewable in a § 1292(b) appeal may be traced to language in cases such as Standard v. Stoll Packing Corp., 315 F.2d 626 (3d Cir. 1963), holding that a grant of or refusal to grant a change of venue authorized by 28 U.S.C. § 1404(a) will not be reviewed under § 1292(b). *See* A. Olinick & Sons v. Dempster Bros., Inc., 365 F.2d 439, 443 (2d Cir. 1966); *cf*. Akers v. Norfolk & Western Railway, 378 F.2d 78, 79 (4th Cir. 1967). Some commentators, relying on the change of venue authorities, have suggested that matters entrusted to the discretion of the district court are not properly reviewable in a § 1292(b) appeal. *See, e. g.*, 9 Moore's Federal Practice ¶ 110.22[2], at 261 (2d ed. 1973); C. Wright, Law of Federal Courts § 102, at 463 (2d ed. 1970). But to extrapolate from the change of venue cases, or even from the commentators' discussion of those cases, a general rule that no district court order involving some exercise of discretion may be reviewed in a § 1292(b) appeal is to misread that statute and to disregard its legislative history.

Section 1292(b) was the result of dissatisfaction with the prolongation of litigation and with harm to litigants uncorrectable on appeal from a final judgment which sometimes resulted from strict application of the federal final judgment rule. In the federal courts prior to 1891 no interlocutory appeals were possible. In that year Congress authorized interlocutory appeals from orders granting or continuing injunctions. Act of March 3, 1891, ch. 517, § 7, 26 Stat. 828. In 1895 it authorized interlocutory appeals from the denial of injunctive relief. Act of Feb. 18, 1895, ch. 96, 28 Stat. 666 (repealed, Act of June 6, 1900, ch. 803, 31 Stat. 660; reenacted, Act of March 3, 1911, § 129, 36 Stat. 1134). In 1900 it included orders in receivership cases. Act of June 6, 1900, ch. 803, 31 Stat. 660. In 1926 it included orders determining liability in admiralty cases prior to the assessment of damages. Act of April 3, 1926, ch. 102, 44 Stat. 233. In 1927 it included orders adjudging infringement in patent cases before an accounting. Act of Feb. 28, 1927, ch. 228, 44 Stat. 1261.[3] These four exceptions to the final judgment rule are included in § 1292(a). All four were in effect when the Judicial Conference of the United States began its consideration of broadening the availability of interlocutory appellate review. That consideration began with a suggestion by Judge Jerome Frank to the 1951 meeting of the Judicial Conference of the United States, which referred the matter to a committee chaired by Judge John J. Parker. Although Judge Frank's particular proposal was rejected, after extensive investigation the committee reported in favor of a draft statute in the form of § 1292(b) and the Judicial Conference approved the report at

---

3. Interlocutory appeals under the Bankruptcy Act of 1898 are treated separately in title 11. See 11 U.S.C. § 47.

its 1953 meeting. The draft statute was transmitted to the House of Representatives in 1957. *See* 3 U.S.Code Cong. & Admin.News, 85th Cong., 2d Sess., pp. 5258–5263 (1958). Judge Parker and Judge Albert B. Maris testified in its support. *See* Hearings Before Subcommittee No. 3 of the House Committee on the Judiciary on H.R.6238, 85th Cong., 2d Sess., ser. 11 (1958) (hereinafter *House Hearings*). Since the bill was enacted exactly as submitted, the Judicial Conference Committee Report and the testimony of representatives of the Judicial Conference before Congress as to what they were attempting to accomplish are the best indication of the legislative intention.

In assessing both the text of § 1292(b) and its legislative history, it must be kept in mind that the draftsmen were not writing on a blank slate. Congress had already, in the four exceptions now embodied in § 1292(a), expressed certain value judgments as to when there should be a departure from the final judgment rule. In the case of grants or denials of injunctive relief or grants or denials of applications for the appointment of receivers, it had focused upon the problem of serious harm to the litigant pendente lite from an erroneous interlocutory order. In the admiralty and patent exceptions it had focused upon avoiding the wasted effort of a possibly protracted litigation over damages where there might be no liability.[4] Thus the draftsmen knew what considerations had historically moved Congress toward relaxation of the final judgment rule. Those historical categories obviously bear upon the interpretation of § 1292(b). The section probably was intended to include orders having similar potential for harm to the litigant pendente lite or similar potential for causing a wasted protracted trial if it could early be determined that there might be no liability. That at least the latter potential was a major concern of the

draftsmen is borne out by the examples given in support of the bill by its proponents. They referred specifically to cases in which a long trial results from a pretrial order erroneously overruling a defense going to the right to maintain the action, to cases involving prolonged assessment of damages after determination of liability, to cases where the disposition of motions for impleader might induce voluntary nonsuit or settlement, and to cases where venue is claimed to have been transferred without proper authority. *House Hearings* at 8, 9.

▮▮▮ The statute imposes three criteria for the district court's exercise of discretion to grant a § 1292(b) certificate. The order must (1) involve a "controlling question of law," (2) offer "substantial ground for difference of opinion" as to its correctness, and (3) if appealed immediately "materially advance the ultimate termination of the litigation." Significantly, while the district judge must certify that the order satisfies the three criteria, the discretion to grant leave to appeal at the circuit level is not limited by any specific criteria. Judge Maris, testifying in support of the bill, analogized the appellate court's discretion to that of the Supreme Court on certiorari. *House Hearings* at 21. Denial of permission to appeal may be based upon a different assessment than that of the district court as to any of the three criteria. But leave to appeal may be denied for entirely unrelated reasons such as the state of the appellate docket or the desire to have a full record before considering the disputed legal issue. And once leave to appeal is granted the court of appeals is not restricted to a decision of the question of law which in the district judge's view was controlling. *Johnson v. Alldredge*, 488 F.2d 820 (3d Cir. 1973).

There can be little difficulty over the criterion of difference of opinion as to correctness of the order. The likelihood is remote that a district judge would

---

4. The admiralty exception also involves potential harm pendente lite to the libelant from having to post security in order to obtain release of the vessel.

make such a certification frivolously with respect to his own order. Certainly the instant case involves an order over which a difference of opinion might exist since it took two district court opinions to arrive at a decision. Nor can there be much difficulty over the requirement of a likelihood of materially advancing the ultimate termination of the litigation. The district court's opinion about settlement possibilities, about the potential length of a possibly avoidable trial, and similar matters, will in most cases, including this case, be at least as informed as that of a panel of this court. The "controlling question of law" requirement is the source of whatever difficulty may arise as to the propriety of an interlocutory appeal.

█ █ A controlling question of law must encompass at the very least every order which, if erroneous, would be reversible error on final appeal. If the statute were interpreted to exclude any such order that interpretation would be inconsistent with the clear intention of the sponsors to avoid a wasted trial. Nor need the order be determinative of any plaintiff's claim on the merits, since a dismissal for want of jurisdiction is within § 1292(b). Zahn v. International Paper Co., *supra*; S.Rep.No.2434, 85th Cong., 2d Sess. 2 (1958) (reprinted in 3 U.S.Code Cong. & Admin.News, p. 5256 (1958)). Nor need a reversal of the order terminate the litigation, since with impleader and transfer of venue orders, two of the sponsors' examples,[5] the lawsuit could continue regardless of the interlocutory determination although an erroneous decision might cause a reversal on appeal from a final order. What remains is the question whether in order for a question to be "controlling" must it be one which if decided erroneously would lead to a reversal on appeal? Certainly Judge Maris, testifying in favor of the bill on behalf of the Judicial Conference, did not think so. His testimony suggests that "controlling" means

serious to the conduct of the litigation, either practically or legally. *House Hearings* at 21; *see* Note, Discretionary Appeals of District Court Interlocutory Orders: A Guided Tour through Section 1292(b) of the Judicial Code, 69 Yale L. J. 333, 343 (1959). And on the practical level, saving of time of the district court and of expense to the litigants was deemed by the sponsors to be a highly relevant factor. See S.Rep.No.2434, 85th Cong., 2d Sess. 2 (1958) (reprinted in 3 U.S.Code Cong. & Admin.News, p. 5256 (1958)).

█ █ The clear case of a controlling question of law—one which would result in a reversal of a judgment after final hearing—serves to focus upon the limited precedential value of statements about the exercise of discretion appearing in § 1292(b) cases dealing with orders granting a change of venue. If an order changes venue to a place where there would be no jurisdiction, no discretion is involved and the certain reversal of the judgment on jurisdictional grounds after trial should be avoided. *See* 28 U.S.C. § 1404(a); *cf.* Swindell-Dressler Corp. v. Dumbauld, *supra*. If there are two districts, either of which would have jurisdiction, but one of which is in the opinion of the district court superior, it is extremely unlikely that a change of venue would result in a reversal after final judgment. As to most such orders it matters little whether one says that they do not decide a controlling question of law or that their review will not materially advance the litigation. However they are decided the litigation will go forward and a resulting final judgment will not, on the basis of the order, be disturbed on appeal. But a district court could so abuse the discretion vested in it by 28 U.S.C. § 1404(a) as to commit error reversible after final judgment. It could, for example, in a case in which credibility of witnesses was crucial, transfer to a venue in which the critical witness on one side was beyond the reach of a subpoena

5. *House Hearings* at 9.

and available for testimony only by deposition. That would be an exercise of discretion. It might also be a ground for the grant of a new trial after final hearing. Obviously such a result should be preventable by a § 1292(b) appeal if the district judge anticipating the problem certified the change of venue order for interlocutory appeal. The key consideration is not whether the order involves the exercise of discretion, but whether it truly implicates the policies favoring interlocutory appeal. The determination of what orders are properly reviewable under § 1292(b) must be made by a practical application of those policies, not by a mechanical application of labels such as "discretionary" or "nondiscretionary." Those policies, both before and since the enactment of § 1292(b) have included the avoidance of harm to a party pendente lite from a possibly erroneous interlocutory order and the avoidance of possibly wasted trial time and litigation expense. In this case, as subsequent discussion will disclose, there exists by virtue of the order appealed from both the possibility of prejudice to a party pendente lite and the possibility of considerable avoidable wasted trial time and litigation expense.

 Commentators on the rule 23 amendments support the view that appeals certified pursuant to § 1292(b) are appropriate for testing whether suitability of class action treatment has been correctly determined. *See* Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 Harv.L.Rev. 356, 390 n.131 (1967); Report of the American Bar Association Special Committee on Federal Rules of Procedure, 38 F.R.D. 95, 104–105 (1965). As the foregoing discussion indicates, we agree with that view. The order appealed from is properly before us.

### Scope of Review

 There remains the question of scope of review of rule 23 class action determinations. That will depend to some extent upon which facet of the multi-faceted determination is challenged on appeal. The district court must determine if the four prerequisites for a class action listed in rule 23(a) have been met. These are mandatory requirements, and our review decides whether the mandates have been met. *E.g.,* Kauffman v. Dreyfus Fund, Inc., *supra*; *cf.* Zahn v. International Paper Co., *supra*. The district court must also determine whether the class action is maintainable under rule 23(b)(1) or (2) so that it may proceed without notice to or identification of the class members. Our review will determine whether the court properly classified the type of class action in reaching its decision as to class action treatment. *E.g.,* Yaffe v. Powers, 454 F.2d 1362, 1366 (1st Cir. 1972). If the class action is maintainable only under rule 23(b)(3) the district court must make two additional findings: (1) that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and (2) that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Both findings require the exercise of an informed judgment as to the application of defined legal standards.

 The predominance finding requires at a minimum the identification of the legal and factual issues, common and diverse, and an identification of the class members to which those relate. We must determine whether the district court has properly identified the factual or legal issues, and has properly identified those which are common. If the district court has properly identified the issues common and diverse, we would undoubtedly defer in most instances to its conclusion as to predominance, since that requirement relates to the conservation of litigation effort, and the trial court's judgment probably will be as good as ours. If the district court has applied the correct criteria to the facts of the case, then, it is fair to say that we will ordinarily defer to its exercise of discretion. But if it has not properly iden-

tified the issues, and not properly evaluated which are common, the order is not entitled to such deference.

 The superiority finding requires at a minimum (1) an informed consideration of alternative available methods of adjudication of each issue, (2) a comparison of the fairness to all whose interests may be involved between such alternative methods and a class action, and (3) a comparison of the efficiency of adjudication of each method. Since, as will be pointed out hereinafter, a single case resulting in a judgment which will be given collateral estoppel effect against a losing defendant is in most rule 23(b)(3) class actions an alternative available method, the comparative fairness and comparative efficiency of that method must be considered. As with the determination of predominance, our review looks first at whether the district court properly applied the relevant criteria to the facts of the case. If this has been done it is fair to say that we will ordinarily defer to its exercise of discretion. But if, for example, the district court has in rejecting alternative available methods of adjudication disregarded possible unfairness of the class action to a particular defendant, its determination is not entitled to such deference. *See* Wilcox v. Commerce Bank of Kansas City, 474 F.2d at 339 & n. 7.

Professor Moore summarizes the scope of review:

"In determining whether an action brought as a class action is to be so maintained the trial court should carefully apply the criteria, set forth in Rule 23 . . ., to the facts in the case; and if it fails to do so its determination is subject to reversal by the appellate court when the issue is properly before the latter court. On the other hand, where the trial court does apply the Rule's criteria to the facts of the case, the trial court has broad discretion in determining whether the action may be maintained as a class action and its determination should be given great respect by a reviewing court." 3B Moore's Federal Practice ¶ 23.50 at 1104–05 (2d ed. 1969).

*Cf.* Greenfield v. Villager Industries, Inc., 483 F.2d 824 (3d Cir. 1973).

### *Carte Blanche's Objections to Class Action Treatment*

Carte Blanche urges that the district court erred both in its finding of superiority and in its findings of predominance. It points out, and Katz concedes,[6] that the claim that Carte Blanche's $15.00 annual fee is an improperly disclosed finance charge is of extremely doubtful validity. Yet the order appealed from directs that notice of this claim be sent to all of its card holders with the suggestion that they may be able to recover the $100 minimum recovery specified in 15 U.S.C. § 1640(a)(1). Carte Blanche points out that almost all of its card holders are also its account debtors, and it foresees the effect, possibly catastrophic to it, that a substantial number of the account debtors will upon receipt of the notice withhold payments. It points out, as well, that at any given time a good many of its account debtors are delinquent entirely apart from delinquency induced by a class action notice. As to

---

6. Appellee's Brief in Reply to Petition for Rehearing at 33:

"The claim of that class is that Carte Blanche's $15.00 annual fee constitutes an improperly disclosed finance charge within the meaning of Truth in Lending. Events which have transpired since this litigation was commenced and since the trial court's determination, make it a near certainty that no liability will be imposed with respect to that claim. The Federal Reserve Board, the agency charged with administration of the

Act and with rule making power, has issued an interpretation declaring such charges not to be finance charges. Subsequent to granting the Motion For Determination of Class Action, the trial court has made it abundantly clear in this and other litigation that it intends to follow that interpretation. Only the failure of the trial and appellate courts to accept the interpretation could conceivably result in the enormous liability upon which Carte Blanche bases its argument."

these account debtors, if after notice they fail to opt out, Carte Blanche will be required under Rule 13(a) of the Federal Rules of Civil Procedure to file a compulsory counterclaim. This course, it urges, would be disruptive of its normal collection practices and of its relations with its account debtors. All those disruptive effects, it urges, will take place even if it prevails in establishing its own full compliance with TILA. It urges that the district court, in making its superiority determination, disregarded these substantial elements of unfairness to it. And the court also disregarded the fact that Congress has afforded to individual litigants a remedy of attorneys fees if they are relegated to individual lawsuits, thus making such relegation not unfair to the individual class members. Moreover, it contends the district court erred in making its predominance finding, since as to each alleged class member it will be entitled to a hearing on the fundamental liability issue of whether the challenged finance charge was imposed in connection with a consumer rather than a business transaction. These individual factual issues, it is urged, heavily predominate over the legal and factual issues relating to Carte Blanche's conduct.

### The Test Case as an Available Alternative Method.

In rejecting Carte Blanche's contention that notice should not be given to its account debtors until its noncompliance with TILA disclosure requirements had been established, the district court discussed and rejected the test case as an available alternative, writing:

"Some confusion surrounded the meaning of the term test case. A classic test case with binding legal effects on all those affected by its outcome is not possible, of course, without the express consent of all those affected, both parties and non-parties. In the case *sub judice* in which the obtaining of the express consent of non-nominal parties is an impracticability, the procedural device by which to bind all non-nominal parties to the outcome of the case is the class action.[3] The term test case as applic-

[3]. Since our circuit has decided that an action proposed as a class action shall proceed as a class action unless and until it is determined otherwise, all members of the proposed class are more properly non-nominal parties than non-parties. See Kahan v. Rosenstiel, 424 F.2d 161 (3d Cir. 1970)." 53 F.R.D. at 540–541.

able here, therefore, means a test case for practical purposes. In other words, if the plaintiff's motion for determination of a class action is denied the instant action becomes, in practical effect, a case not legally binding upon anyone other than Mr. Katz, and it is the superiority of that alternative which we must evaluate.

■■ There is in Kahan v. Rosenstiel, 424 F.2d 161, 169 (3d Cir. 1970), language similar to the district court's footnote 3, but in the footnote it is taken out of context. We said in Kahan v. Rosenstiel that an alleged class action should be treated as such for purposes of dismissal or compromise until there is a full determination that a class action is not maintainable. We did not, as the district judge apparently believed, rule in Kahan v. Rosenstiel on the question when in a rule 23(b)(3) case the class action determination must be made. Rule 23(c)(1) provides that the determination should be made as soon as practicable after the commencement of the action. But "[a]s soon as practicable" must mean as soon as practicable in the light of the relevant rule 23(b)(3) factors of predominance and superiority. Where the defendant seeks a postponement of that determination on the ground of fairness, as soon as practicable does not necessarily mean at the outset of the lawsuit.

The district court points out that if Katz' case went forward alone it would not be binding upon anyone other than Mr. Katz. That is only partly true. Judgment against Katz would not protect Carte Blanche against other class

members, but judgment for Katz would bind Carte Blanche in suits by other class members. In making its superiority determination the district court overlooked that factor, and disregarded the fact that Carte Blanche was content to take its chances on stare decisis rather than res judicata. No reference was made to the Supreme Court's decision in Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), or to the well-developed jurisprudence in this circuit flowing from Judge Hastie's well-known decision in Bruszewski v. United States, 181 F.2d 419 (3d Cir.), cert. denied, 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950). To understand the relevance of *Blonder-Tongue* and *Bruszewski* to the superiority finding one must start with a consideration of case law under the old rule 23. Prior to the 1966 amendments, cases which would now be covered by rule 23(b)(3) were commonly referred to as spurious. In York v. Guaranty Trust Co., 143 F.2d 503, 529 (2d Cir. 1944), rev'd on grounds not here relevant, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), Judge Frank for the Second Circuit and in Pentland v. Dravo Corp., 152 F.2d 851, 856 (3d Cir. 1945), Judge Goodrich for this court suggested that it would be proper to make the class action determination and permit class members to intervene after the defendant's liability had been determined in the single lawsuit. In Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561, 588–589 (10th Cir. 1961), petition for cert. dismissed, 371 U.S. 801, 83 S.Ct. 13, 9 L. Ed.2d 46 (1963), the Tenth Circuit held that such "one-way" intervention after a judgment adverse to the defendant was proper. Many commentators objected that one-way intervention had the effect of giving collateral estoppel effect to the judgment of liability in a case where the estoppel was not mutual. This was thought to be unfair to the defendant. To meet the point that one-way intervention was unfair to the defendant, the Advisory Committee on the Federal Rules concluded that class members should be brought in prior to the determination of defendant's liability, thus making the estoppel mutual. *See* Advisory Committee's Note to Proposed Amendments to Rule 23, 39 F.R.D. 69, 105 (1966); Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 Harv.L.Rev. 356, 385 (1967). To make joinder at an early stage practically achievable, the "opting out" mechanism was devised. The literature on the development of rule 23(b)(3) makes it quite clear that the early notice requirement was directly related to dissatisfaction with the lack of mutuality of the estoppel which resulted from the *York, Pentland, Nisley* rule.

Of course the 1966 amendment to rule 23(b)(3) was also based upon the underlying assumption that class action disposition of multiple similar claims, especially small consumer claims, is socially desirable. But the socially desirable effects, looked at from the point of view of anyone other than the defendant, were as achievable under the *York, Pentland, Nisley* rule as under a rule prohibiting one-way intervention. A major social policy in favor of the § 23(b)(3) class action is the prevention of multiple relitigation of the factual and legal issues as to a defendant's liability. The *Nisley* result accommodated that policy perfectly in any case where liability was established. In cases where the defendant prevailed, other class members were, of course, free to try again. But practically speaking, stare decisis provided a substantial deterrent in most instances. Another major social policy in favor of the § 23(b)(3) class action is its encouragement of private enforcement on behalf of small claimants. Again the *Nisley* result accommodated that policy, since notice could be given to all potential claimants once the defendant's liability was established. Moreover a fee award could be made in light of the value of the benefit conferred on the entire class. Lindy Bros. Builders, Inc. v. American

Radiator & Standard Sanitary Corp., 487 F.2d 161 (3d Cir. 1973); Kahan v. Rosenstiel, *supra.* The objection to the *Nisley* result was not any conflict with the policies favoring class action litigation, but a conflict with Bigelow v. Old Dominion Copper Mining & Smelting Co., 225 U.S. 111, 32 S.Ct. 641, 56 L.Ed. 1009 (1912). That case had announced "[i]t is a principle of general elementary law that the estoppel of a judgment must be mutual." *Id.* at 127, 32 S.Ct. at 642. Judge Hastie by 1950 in *Bruszewski* did not think the principle was quite so elementary as it had seemed in 1912. In 1970 the Supreme Court unanimously rejected the authority of the *Bigelow* case. Blonder-Tongue v. University of Illinois, *supra. Ratio est legis anima; mutata legis ratione mutatur et lex.*

■■ In this case Carte Blanche seeks not to have conferred upon it what it perceives to be the dubious benefit of mutual estoppel. It is perfectly willing to run the risk that if it loses the class may later be enlarged rather than, as Katz suggests, contracted.[7] We think the *Blonder-Tongue* decision requires that a new look be taken at the alternative of a test case in lieu of an early class action determination. That new look must, as with all rule 23(b)(3) superiority determinations, take into account several different interests. Superiority must be looked at from the point of view (1) of the judicial system, (2) of the potential class members, (3) of the present plaintiff, (4) of the attorneys for the litigants, (5) of the public at large and (6) of the defendant. The listing is not necessarily in order of importance of the respective interests. Superiority must also be looked at from the point of view of the issues.

■ Turning to the issues in this case there is legally and factually a clear line between the question whether Carte Blanche has made the disclosures re-

quired by TILA and the question whether any given card holder is a consumer or a business user. Whether or not class action treatment is given at the outset, the judicial system will not, since the *Blonder-Tongue* case, be required to relitigate after a finding that Carte Blanche did not make the required disclosures. If there is a finding for the defendant on liability, the judicial system will be protected from relitigation of the essentially legal issue of compliance with TILA regulations by the discouragement of relitigation afforded by stare decisis. Where, as here, the defendant makes a nonfrivolous claim that it will be prejudiced by the mailing of notice, it is hardly fair to say that the judicial system must insist on res judicata rather than collateral estoppel or stare decisis. Especially is this so when it is recalled that the plaintiff, not the judicial system, controls whether or not to ask for class action treatment. As to the issues relating to consumer versus business use, a postponement of those issues until violation is decided will actually protect the judicial system from time and expense which might have been wasted on them in a nonliability case. Moreover the judicial system may, by postponing class action treatment until a violation has been proved, avoid whatever time and expense it, as distinguished from the parties, might have incurred in the preparation of the notice.

Postponement of class action determination until the violation has been proved in no way prejudices the potential class members. If Katz loses his case on violation they will not be bound. If Katz establishes the violation they can be afforded the same opting out option, but the notice will advise them that there is a judgment establishing violation, and their decision will be more informed than if the notice was sent early in the proceedings. The only real potential for harm to the absent class mem-

---

7. Any problem arising out of the doubt expressed by Judge Seitz as to the extent of the demise of mutuality of estoppel can be resolved by conditioning postponement of no- tice upon the filing of an appropriate stipulation by the defendant agreeing to be bound in favor of potential class members by an adverse determination of liability.

bers, the running of the statute of limitations, once thought to be a possible problem, has been eliminated by the holding in American Pipe & Construction Co. v. Utah, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), that the filing of a class action complaint tolls the running of the statute of limitations for the entire class. The Court has thus adopted the same holding of the Tenth Circuit in the *Nisley* case. It might be suggested that the seventh amendment gives the absent class members a right to a unitary trial as to all issues of liability and damages before a single jury. This can hardly be the case as to the absent class members, however, since it is under rule 23 discretionary with the court whether they will be included in the case at all. If the seventh amendment presents any problem at all, it is a problem related to the rights of the defendant. And more practically, even the order appealed from contemplates a non-unitary determination of liability and damage issues relating to the individual class members.

As to the original plaintiff, Katz, he is not affected with respect to the amount of his recovery or with respect to the trial of the case. He may be protected from the expense, in this case $37,500, of mailing out a notice to parties who have no rights. If he first establishes a violation, the district court may conclude that the defendant rather than he should bear the initial cost of the mailing. The only possible adverse effect upon him of postponing the class action determination until after he proves a violation is that it may be more difficult for him to obtain an attorney willing to pursue his claim. Further reference will be made to the effect of postponing the class action determination upon the willingness of attorneys to undertake such cases in the next paragraph. Here, we point out that in TILA Congress has provided for the award of reasonable attorneys fees. 15 U.S.C. § 1640(a)(2). It seems unlikely that actions under TILA or any other federal regulatory statute providing for the award of reasonable attorneys fees are likely to go begging for want of an attorney.

We have no doubt that the maximization of potential recoveries in a single lawsuit which has resulted from the 1966 amendments to rule 23 has produced the desirable effect of interesting outstanding attorneys in the pursuit of consumer protection lawsuits. The encouragement of that interest is a legitimate consideration in the district courts' administration of rule 23(b)(3). It is not, however, the sole consideration. Fairness is an explicit criterion for a superiority determination, and fairness to the defendant must be balanced against any disincentive for class action litigation which might result from the possibility of postponing the class action determination until a violation has been proved. The major incentive to the bar is the possibility of aggregating small claims. That incentive is no different, since the same class members will be opted in once a violation has been proved, and the attorney's fee will be measured to the same extent as heretofore by the benefit conferred upon the class. Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., *supra*; Kahan v. Rosenstiel, *supra*. Another incentive to the bar is the increased settlement leverage which results from aggregating small claims. That incentive is no different, for the potential for aggregation if a violation is proved still remains, and the defendants will be under no less compulsion to make a settlement offer to the class, when confronted with a legitimate claim of violation, than in the past. Indeed we have observed that not infrequently settlement negotiations do precede class action determinations. *See* Greenfield v. Villager Industries, Inc., *supra*. What the attorneys would be deprived of by postponement of class action determination until a violation has been proved is the additional settlement leverage which results from the disruption or injury which may occur to a defendant's business relationships regardless of the mer-

its of the claim by the mere sending of the notice. That leverage is said by the instant defendants to be considerable. It is, we think, less than a legitimate use of a procedural device. If its absence provides some disincentive to attorneys' pursuit of class actions, that disincentive must be tolerated in the interest of fairness.

The public at large has an interest in the fact that the class action device provides supplementary enforcement of regulatory statutes. What we have said about disincentives to attorneys' pursuit of those actions applies as well to the public interest. There is incentive enough in the possibility of aggregating small claims without adding to the leverage resulting from aggregation any untoward effects resulting from notice in possibly groundless actions.

■■■■ Finally, turning to the defendant's interest, it must be understood that we are dealing only with the defendant who declines the protection against one-way intervention after a violation has been proved which rule 23(b)(3) was designed to afford. If a class action defendant insists upon early class action determination and notice, he is, under the rule, entitled to it. But where he makes a nonfrivolous claim that his business will be harmed or disrupted by the notice, and is willing to run the risk that the determination of liability, if he loses, will be given effect in favor of the class, with notice in the event of such determination, the district court must seriously consider that alternative, and should, absent other compelling circumstances, pursue that course. A defendant taking such a position would, of course, be deemed to have waived any seventh amendment right to a unitary trial before a single jury on all issues, and would realize that the statute of limitations was tolled in favor of the class. He would lose, as well, the collateral estoppel effect against the class of a favorable judgment on liability.[8]

### Manageability.

■■■■ As a separate ground of appeal Carte Blanche contends that the district court erred in concluding that it could manage the problem of determining, separately as to each, which of 800,000 potential class members were nonbusiness credit card users. Although the literature and case law under rule 23 often refer to a finding of "manageability" as a separate requirement for a class action determination, it is actually one of the nonexclusive factors which is to be taken into account in making the required findings of predominance and superiority. We have concluded that the order appealed from must be reversed because the superiority finding was in error. With the procedure we have suggested, the class, if any, ultimately to be included and receive notice may be considerably smaller than 800,000. The management problem later in the case may be considerably different than appears at this juncture since at a later stage the content of the notice may be considerably more specific. If suffices to say at this point that determining which of 800,000 claimants was a consumer rather than a businessman, if the defendant chooses, as it may, to insist on proof as to each, appears on the surface to present formidable management problems and will undoubtedly be reconsidered if the district court concludes that

8. We do not in this case decide whether, if the basis for federal jurisdiction is solely diversity, the cause of action arises under state law, and the applicable state law requires mutuality of estoppel, the class action determination may be postponed and late opting is permitted. *Compare* Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), *with* Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L. Ed.2d 8 (1965). *Cf.* Guffey v. Smith, 237 U.S. 101, 35 S.Ct. 526, 59 L.Ed. 856 (1915). Such class actions are comparatively rare. *But see* Zahn v. International Paper Co., *supra.* Early notice in many diversity cases may have no adverse effects on the defendant. Moreover *Blonder-Tongue* probably will be followed in the future by many states which have not yet abandoned the mutuality of estoppel requirement.

Katz has proved all three claimed violations.[9]

### Class Actions and the Truth in Lending Act

Carte Blanche urges as an additional objection to the district court's order that in enacting 15 U.S.C. § 1640(a) and in particular the penalty provision in § 1640(a)(1), Congress intended that the penalty could be recovered only in an individual and not in a class action. It points to the attorneys fee provision in § 1640(a)(2) as suggesting such an interpretation. Neither of the district court opinions explicitly passed upon that contention. Carte Blanche urges, however, that it is implicit in the district court's superiority determination. It does not appear to have been decided even implicitly for, as Carte Blanche concedes in its petition for rehearing, there is no suggestion that Congress intended to prohibit the recovery of actual damages in

9. We note that of the 51 district courts considering motions for class actions under TILA, 40 have denied such motions while only 11, including the district court in this case, have permitted a class action to proceed. Denied: Mourning v. Family Publications Serv. Inc., Civ.No. 70–559 (S.D.Fla. Nov. 27, 1970); Allerton v. Century Credit Corp., Civ.No. 70–1614 (S.D.Fla. Nov. 27, 1970); Buford v. American Fin. Co., 333 F. Supp. 1243 (N.D.Ga.1971); Ratner v. Chem. Bank New York Trust Co., 54 F.R.D. 412 (S.D.N.Y.1972); Gerlach v. Allstate Co., 338 F.Supp. 642 (S.D.Fla.1972); Rogers v. Coburn Fin. Corp., 54 F.R.D. 417 (N.D.Ga. 1972), modifying 53 F.R.D. 182 (N.D.Ga. 1971); Kenney v. Landis Financial Group, Inc., 349 F.Supp. 939 (N.D.Iowa 1972); Shields v. Valley Nat'l Bank, 56 F.R.D. 448 (D.Ariz.1971); Wilcox v. Commerce Bank, 55 F.R.D. 134 (D.Kan.1972), aff'd, 474 F.2d 336 (10th Cir.` 1973); Roesel v. Fulton Nat'l Bank, Civ.No. 15376 (N.D.Ga., May 25, 1972); Grubb v. Dollar Loan Co., Civ.Nos. 15550, 15976 (N.D.Ga., May 25, 1972); Shields v. First Nat'l Bank, 56 F.R.D. 442 (D.Ariz.1972); Greer v. Sears, Roebuck & Co., Civ.No. 72–80 (S.D.W.Va., July 3, 1972); Kriger v. European Health Spa, Inc., 56 F.R.D. 104 (E.D.Wis.1972); Boggs v. Alto Trailer Sales, Inc., Civ.No. 71–1271 (E.D.La., Aug. 7, 1972); Haynes v. Logan Furniture Mart, Inc., Civ.No. 70–C–1827 (N.D.Ill., Sept. 20, 1972); Goldman v. First Nat'l Bank, 56 F.R.D. 587 (N.D.Ill.1972); Johnson v. Austin Furniture, Inc., Civ.No. 72–C–724 (N.D.Ill., Oct. 10, 1972); Garza v. Chicago Health Clubs, Inc., 56 F.R.D. 548 (N.D.Ill.1972), modifying 329 F.Supp. 936 (N.D.Ill.1971); Rodriquez v. Family Publications Serv., Inc., 57 F.R.D. 189 (C.D.Cal. 1972); Alsup v. Montgomery Ward & Co., 57 F.R.D. 89 (N.D.Cal.1972); Mullen v. Montgomery Ward & Co., Inc., 57 F.R.D. 89 (N.D.Cal.1972); Kroll v. Cities Serv. Oil Co., 352 F.Supp. 357 (N.D.Ill.1972); Hunter v. Gross Bros. Furniture Inc., Civ.No. C–71–2443 (N.D.Cal., Dec. 20, 1972); Winston v. Nat'l Bank of Commerce, Civ.No. 71–1986 (E.D.La., Feb. 9, 1973); Berkman v. Sinclair Oil Corp., 59 F.R.D. 602 (N.D.Ill. 1973); Roth v. Community Nat'l Bank, Civ. No. C–72–1031 (N.D.Ohio, Mar. 13, 1973); Lindig v. City Nat'l Bank, 59 F.R.D. 154 (S.D.Ohio 1973); Coleman v. City Fin. Co., Inc., Civ.No. 72–685–K (D.Md., Mar. 27, 1973); Hollis v. Tucker, Civ.No. 72–735–K (D.Md., Mar. 27, 1973); Graybeal v. American Sav. & Loan Ass'n, 59 F.R.D. 7 (D.D. C.1973); Pennino v. Morris Kirschman & Co., Inc., Civ.No. 72–1339 (E.D.La., Apr. 27, 1973); Altenbach v. Francis Ford, Inc., Civ.No. 72–963 (D.Or., Apr. 30, 1973); Steelreath v. American Nat'l Bank & Trust Co., Civ.No. 6799–71–P (S.D.Ala., May 23, 1973); Griffin v. First Nat'l Bank, Civ.No. 6800–71–P (S.D.Ala., May 23, 1973); Hoffman v. Charnita, Inc., 58 F.R.D. 86 (M.D. Pa.1973); Alpert v. U. S. Indus., Inc., 59 F.R.D. 491 (C.D.Cal.1973); Richmond v. Railey's Appliance Center, Inc., 59 F.R.D. 641 (E.D.Va.1973); Fisher v. First Nat'l Bank, Civ.Nos. 72–0–156, 82–0–157 (D.Neb., June 20, 1973); Turoff v. May Co., No. C71–948 (N.D.Ohio, July 23, 1973). Granted: Martin & Alexander v. Family Publications Serv., Inc., No. 5829 (D.Vt., June 30, 1970); Richardson v. Time Premium Co., Civ.No. 70–1814 (S.D.Fla., Feb. 4, 1971); Douglas v. Beneficial Fin. Co., 334 F.Supp. 1166 (D.Ala.1971), rev'd on other grounds, 469 F.2d 453 (9th Cir. 1972); Smith v. International Magazine Serv. of Mid Atlantic, Inc., Civ.No. 71–16–F (N.D. W.Va., Oct. 29, 1971); Katz v. Carte Blanche Corp., 52 F.R.D. 510, 53 F.R.D. 539 (W.D.Pa.1971); Joseph v. Norman's Health Club, Inc., 336 F.Supp. 307 (D.Mo.1971); La Mar v. H & B Novelty & Loan Co., 55 F.R.D. 22 (D.Or.1972); Flickinger v. Horseshoe Dev. Corp., Civ.No. 11–334–C–1 (S.D.Iowa, March 10, 1972); Kristiansen v. John Mullins & Sons, Inc., 59 F.R.D. 99 (E.D.N.Y.1973); Eovaldi v. First Nat'l Bank, No. 71 C 1654 (N.D.Ill., June 15, 1973), modifying 57 F.R.D. 545 (N.D.Ill. 1972); McDermott v. Hollander, 60 F.R.D 643 (E.D.La.1973).

a class action. The district court has not yet determined whether it will award statutory penalties as well as damages. Its superiority determination would have been no different on the assumption that class members might recover actual damages only. Our reversal does not turn on the difference between actual damages and statutory penalties. We cannot exercise appellate jurisdiction over an issue not yet decided in the district court.

The order appealed from will be reversed and the case remanded to the district court for further proceedings consistent with this opinion.

SEITZ, Chief Judge (dissenting).

The unarticulated major premise of the majority decision is a distaste for class actions, at least in the present context. I do not believe such distaste, however widely shared, justifies judicial emasculation of Rule 23.

*Appealability*

This appeal comes to us pursuant to 28 U.S.C. § 1292(b) (1970). Section 1292(b) permits appeal of interlocutory orders that involve "a controlling question of law as to which there is substantial ground for difference of opinion . . . [if] appeal from the order may materially advance the ultimate termination of the litigation . . . ." The majority correctly notes that the primary reason for allowing appeals under § 1292(b) is to avoid wasted trials and harm to the litigants. After a brief nod to the statute's terms, the majority completes its syllogism by stating that allowing appeal of class action determination orders can avoid wasted trials, therefore this order is appealable.

In turning to the statute's underlying policy for guidance, the majority has examined only the reason for expanding the availability of interlocutory appeals, and has ignored the countervailing considerations for allowing appeal of less than all interlocutory orders. If we take avoidance of wasted trials as our sole guide, a multitude of interlocutory orders become appealable. The draftsmen and proponents of § 1292(b), however, were of the view that it provided for review of interlocutory orders only in "exceptional" cases. See 1958 U.S.Code, Cong. & Admin.News, pp. 5255, 5259, 5260–5261. The draftsmen's desire to limit availability of such review to exceptional cases reflected another policy consideration underlying § 1292(b): need to avoid piecemeal review and its attendant delays and waste of time. *Id.* at pp. 5257, 5259, 5261–5263. As was noted in the letter accompanying the Judicial Conference's draft bill:

> It has always been recognized that there are two competing considerations bearing upon appeals from interlocutory orders. On the one hand too rigid a bar against such appeals . . . may result in injustice by preventing at an early stage the final decision of an issue which might be determinative of the case and burdening the parties with the expense of subsequent proceedings, perhaps prolonged, to no avail. On the other hand too great freedom in taking appeals from orders of the district court prior to the final judgment, "piecemeal appeals" as they are called, may make for delay and increase the expense of the litigation.

*Id.* at p. 5259.

Attempting to harmonize the competing considerations, the draftsmen required two courts to agree that an appeal was proper and limited the class of appealable orders to those involving questions of law, controlling the order, as to which there was substantial ground for difference of opinion. This limitation gives the chance for appeal before final judgment where a "clean" legal issue is involved, one as to which the controlling legal principles are in dispute but which does not require the appellate court to make fact determinations.

The majority takes great care in demonstrating that even orders involving the exercise of discretion are appealable.

I quite agree. Yet that does not advance the majority's argument. For no one contends that orders involving the exercise of discretion cannot be appealed under § 1292(b). What numerous courts have stated, in ruling on appeals from a variety of orders, including inter-district transfers, is that appeals cannot be maintained under § 1292(b) to test the propriety of a district judge's exercise of discretion. E. g., United States v. Salter, 421 F.2d 1393, 1394 (1st Cir. 1970); Akers v. Norfolk & Western Railroad Co., 378 F.2d 78, 79 (4th Cir. 1967); J. C. Trahan Drilling Contractors, Inc. v. Sterling, 335 F.2d 65 (5th Cir. 1964); Phelps v. Burnham, 327 F.2d 812, 814 (2d Cir. 1964); Standard v. Stoll Packing Corp., 315 F.2d 626 (3d Cir. 1963). Were § 1292(b) available to review simply the exercise of discretion, appellate courts, prior to final judgment, would be engaged in the time-consuming weighing of facts that the section's drafters sought to avoid.

Yet an order involving the exercise of discretion may also involve a question of law that allows appeal under § 1292(b). Two transfer cases in the Second Circuit illustrate this point. In A. Olinick & Sons v. Dempster Bros., Inc., 365 F.2d 439 (2d Cir. 1966), the court stated that § 1292(b) was unavailable to review the district judge's exercise of discretion in evaluating certain factors supporting his order. *Id.* at 442–443. Just three years later, the court declared that transfer orders were appealable under § 1292(b) where a question was raised concerning the district court's power to transfer. Farrell v. Wyatt, 408 F.2d 662, 664–665 (2d Cir. 1969).[1]

Were the order before us questioned solely on the grounds decided by the majority, that the district judge abused his discretion, it would not be appealable

prior to final judgment. The order granting class status, however, involved another question: whether the Truth in Lending Act implicitly prohibits maintenance of class actions to enforce its provisions. This question is one of law, decision of which controls the order before us. I would find the order appealable on this ground.

### Standard of Review

Although construction of the Truth in Lending Act presents the controlling question of law that makes the order appealable under § 1292(b), the Court of Appeals is instructed to decide the appeal, not merely the question making the order appealable. Johnson v. Alldredge, 488 F.2d 820, 822–823 (3d Cir. 1973). This approach recognizes that once an order is before the court, judicial economy mandates a complete decision of its propriety, including decision of questions that, if alone involved, would not render an order appealable. Thus, I agree with the majority that, unless the Truth in Lending Act bars any class action, we must determine whether the district judge abused his discretion in determining that this suit could be maintained as a class action.

My agreement with the majority, however, needs qualification, for the majority, while reviewing the district court's exercise of discretion, purports not to be concerned with it. The majority first fractures the district court's class action determination into a non-discretionary component, identification of the proper factors to be considered, and a discretionary component, evaluation of the factors; next, the majority elaborates the proper criteria and, still purporting to scrutinize the non-discretionary component of the class action determination, looks "at whether the district court

---

1. Another illustration of this point is provided by Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122 (5th Cir. 1969). The appeal in *Johnson* was not simply on the ground that the district court abused its discretion in entering a class action determination order. Rather, the order appealed from in *Johnson*, in addition to restricting the class, in effect holding that plaintiff was not a proper class representative, denied a motion to strike defendant's demand for a jury trial. The availability of a jury trial was a controlling legal question allowing appeal of the order under § 1292(b).

properly applied the relevant criteria to the facts of the case" (which appears to be an examination of precisely the matter the majority identified as within the district court's discretion); finally, the majority reverses the district court for improperly finding a class action superior to other forms of proceeding, the reason for reversal being that postponement of the class action determination is deemed by the majority superior to an affirmative class action determination.

My view of the matter is somewhat simpler. Rule 23(b)(3) of the Federal Rules of Civil Procedure requires the district judge to find that questions of law or fact common to the class predominate over questions relevant only to individual class members and that the class action is the superior form for resolution of some or all of the issues. The district court must exercise its informed discretion in making these findings and can be reversed as to the propriety of these findings only for abuse of discretion. Cypress v. Newport News General & Non-Sectarian Hospital Association, 375 F.2d 648, 653 (4th Cir. 1967) (in banc). To guide the district court in making these findings, the rule provides a "non-exclusive listing" of relevant considerations. Advisory Committee's Notes on Proposed Amendments to the Federal Rules of Civil Procedure, 39 F. R.D. 69, 103–104 (1966). These considerations, interest of class members in pursuing individual actions, extent of pending related litigation, desirability of concentrating proceedings in the forum court, and manageability of a class action, were taken into account by the district judge in his findings on superiority and predominance. Thus, according to the majority's authority for selection of its review standard, unless the judge abused his discretion, or the Truth in Lending Act bars this class action, his order should be affirmed. J. Moore, 3B Moore's Federal Practice, ¶ 23.50 (2d ed. 1969).

## Superiority

The ground relied on by the majority in reversing the district court was superiority. . I must disagree with the majority because I cannot say that the district judge abused his discretion in finding a class action superior to other means for disposing of this litigation.

The district court's mistake, according to the majority, was its failure to perceive the benefits of postponing a class action determination until after a determination of Carte Blanche's liability. One stumbling block to the majority's approach is Rule 23(c)(1), which provides that "[a]s soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained." Considering this recent provision (1966) in the light of case law developments, the majority decides that that portion of the rule no longer performs a useful function. The provision, the majority declares, was adopted to prevent "one-way intervention," distaste for which was bottomed on the requirement of mutuality of estoppel. The majority goes on to claim that the mutuality test was interred by the Supreme Court in Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

Passing over the fact that the quoted language of the rule remains, there is some question as to the extent to which the reason has been changed. The Supreme Court's *Blonder-Tongue* decision does not appear to have killed mutuality outright, although the wound inflicted there may someday prove fatal. The Court was careful to note that *Blonder-Tongue* did not involve "offensive estoppel", that is, use, to establish liability, of "a judgment obtained by a different plaintiff in a prior suit against the same defendant." 402 U.S. at 329–330, 91 S. Ct. at 1443 [footnote omitted]. The attempted use of estoppel in *Blonder-Tongue* was to prevent a patent holder

from suing on his patent after it had been held invalid. After identifying the narrow issue before the Court and discussing the effect of the patent law on it, the Court examined the economic consequences of requiring mutuality in patent suits where patent invalidity was asserted as the defensive estoppel. *Id.* at 334–348, 91 S.Ct. 1434. The Court's abandonment of a mutuality requirement for the particular type of estoppel involved in *Blonder-Tongue* was based largely on its analysis of the cost of continued adherence to mutuality—that economic analysis makes up roughly one-half of the Court's opinion and emphasizes that "although patent trials are only a small portion of the total amount of litigation in the federal courts, they tend to be of disproportionate length." *Id.* at 348, 91 S. Ct. at 1452 [footnote omitted].

The majority does not analyze the economic consequences of continued adherence to the mutuality requirement in cases such as the one before us, nor does the majority face the peculiar difficulties often thought to inhere in "offensive" use of estoppel. Instead, the majority simply assumes that mutuality is no longer required for assertion of an estoppel for any purpose in any case.[2] On this unsturdy foundation, the majority builds its argument that it was error for the district court to make an affirmative class action determination at this stage of the proceedings.

To reach its desired result the majority makes a number of factual assumptions without any record basis. Among these questionable assumptions are: (1) that Carte Blanche's card holders will, no matter how clearly worded the notice, withhold payments to Carte Blanche on learning of this suit; (2) that Carte Blanche will be harmed by assertion of compulsory counterclaims; (3) that a lawyer would take a $100 case if he could get "reasonable attorney's fees" if

successful; and (4) that a lawyer of exceptional competence would be as likely to prosecute an individual action as a class action. The majority's reliance on such factual assumptions indicates the extent to which review for abuse of discretion requires fact evaluation—these evaluations are entrusted to the district court, and courts of appeals are not supposed to substitute their judgment for the district courts'. The majority's need to engage in fact evaluation and to rely for reversal on assumed facts, not found by the district court, also indicates why the exercise of discretion does not justify § 1292(b) review.

The end result of the majority's assumptions, some specific to this case and some general, is that, prior to judgment on liability, no order determining that a class action may be maintained is proper where (1) the defendant objects and (2) plaintiff can, if successful, recover reasonable attorney's fees. I do not read Rule 23 as limiting availability of class action treatment to the narrow class of cases not covered by the majority's rule. The district court has, after evaluating the factors listed in Rule 23(b)(3), found that a class action would be superior to other forms of proceeding. Since Carte Blanche has failed to demonstrate any abuse of the district court's discretion, I would not reverse the district court's order as based on a faulty superiority finding.

Carte Blanche does attack vigorously the district court's conclusion, supporting its superiority finding, that this suit would be manageable as a class action. The majority does not reach the issue of manageability, at this state in the proceedings, of a class action. Carte Blanche contends that since only consumer credit, not business, uses of the company's card can serve as the basis for a Truth in Lending suit, the district

---

2. Professor Wright has expressed a view on this matter diametrically opposed to the position taken by the majority. He would not allow the offensive use of estoppel in class

action situations even where there are no other limits on use of estoppel. C. Wright, Federal Courts 314 (2d ed. 1970).

court would first have to ascertain each plaintiff's use of his card. I note that this examination of card use goes not to the legal issues connected with Katz' allegations of liability but to each plaintiff's entitlement to class membership.

So long as the class representative is a bona fide consumer user of the card, the use each purported class member makes of his card need not be determined before a determination on the controlling legal issues. The district court can, of course, make its class determination conditional and can modify its interim class determination at any time during the proceedings. Fed.R. Civ.P. 23(c)(1). I would, therefore, reject Carte Blanche's argument that this suit is inherently unmanageable as a class action.

### Predominance

The district court's finding that common issues of law or fact predominate is, like its superiority finding, judged by the abuse of discretion standard. The primary argument advanced by Carte Blanche in urging that the district court abused its discretion in finding that common questions are predominant is that individual consideration of each class member's card use is required. Rule 23(c)(4)(A) provides that "[w]hen appropriate . . . an action may be brought or maintained as a class action with respect to particular issues, . . . and the provisions of this rule shall then be construed and applied accordingly." The Rules Committee, in adding this subsection, clearly indicated that class action treatment might be appropriate for resolution of common questions even though other issues may have to be litigated individually. Advisory Committee's Notes, *supra* at 106.

Since the district court may treat the basic legal issue as to liability separately from determination of each individual's proper class membership, I would accept the district court's finding as to predominance.[3] Having abused its discretion neither in finding that a class action is superior to other means for resolution of the case nor in finding a predominance of common questions, the district court's order should be affirmed unless class action enforcement is forbidden by the Truth in Lending Act.

### Truth in Lending

In light of my belief that the district court has not abused its discretion in its findings on predominance and superiority, I must reach Carte Blanche's contention that Congress intended that only individual suits be allowed for enforcement of the Truth in Lending Act (hereinafter "the Act"). This was Carte Blanche's principal argument before the panel that heard this case and also was argued on rehearing. The district court, however, did not explicitly reach this contention, and the majority declares that appellate jurisdiction cannot be exercised "over an issue not yet decided in the district court."

The majority's view of the scope of appellate review differs considerably from what I had thought to be the law on that subject. After making reviewable under § 1292(b) every interlocutory discretionary determination on class action status, the majority abstains from deciding an issue simply because it was not spoken to below. We review orders, rulings and judgments, not issues; any issue relevant to the order, ruling or judgment may be considered on appeal, so long as a party or the court has a right to raise it. Whether the issue was

---

3. While the district court elected to divide the class into subclasses under 23(c)(4)(B), rather than first to divide the suit by issues under 23(c)(4)(A), the availability of 23(c)(4)(A) for use by the district court makes graphic the difficulty with holding, before final judgment, that a court abused its discretion in finding predominance. The district judge noted in his opinion that he might utilize 23(c)(4)(A) in this case. 53 F.R.D. 539, 543 (E.D.Pa.1971). I note that if liability is found, the district judge may decide that the question of individual damage, as well as individual entitlement to recover as a consumer user of the card, is better left to individual proceedings.

decided below is immaterial, given its relevance to some judicial action properly under review. Some issues, such as subject matter jurisdiction, may be raised on appeal by the court or even by the party who invoked the lower court's jurisdiction. See Brown Shoe Co. v. United States, 370 U.S. 294, 305–306, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); American Fire & Casualty Co. v. Finn, 341 U.S. 6, 17–18, 71 S.Ct. 534, 95 L.Ed. 702 (1951). Other issues may be lost if not raised below, but having been raised below, the appellate court may find decision of those issues essential to disposition of the appeal, even where the lower court's decision was on other grounds. See Helvering v. Gowran, 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224 (1937). Carte Blanche in its answer to the complaint raised its contention that class action treatment here is inconsistent with the Act. Rejection of that contention is necessary for affirmance.

As the majority observes, Carte Blanche's argument, that this case cannot, consistent with the Act, be maintained as a class action, is based in part on the erroneous assumption that Katz and other class members seek only the imposition of the $100 minimum penalty provided by the Act. The argument, however, is not defeated by that observation. The heart of Carte Blanche's contention is that permitting class action enforcement of the Act would expose Carte Blanche, and other credit card companies, to possibly staggering judgments. The possible loss is not lessened by the fact that the class involved here seeks damages possibly in excess of the statutory minimum recovery.

Carte Blanche concedes the lack of legislative history supporting its contention, but explains that "the potentially annihilating effect" of imposing liability of at least $100 per plaintiff-card holder in a class action "was never brought to the attention of Congress at the time the Act was being considered." In attempting to show that, nonetheless, the intent of Congress in passing the Act is inconsistent with class action enforce-ment, Carte Blanche relies on (1) the Act's attorneys' fees provision and (2) an appeal to common sense. Carte Blanche's argument on the first point is that availability of attorneys' fees to successful plaintiffs is a boon to individual actions and inclusion of this provision in the Act indicates an intent to promote individual, not class, enforcement. All that can be inferred from inclusion in the Act of a provision for award of fees in successful enforcement suits is that Congress desired to encourage private suits to enforce the Act; no necessary, or even probable, inference can be drawn that Congress intended to promote individual suits and prohibit class suits.

Carte Blanche's second argument is that liability for large judgments could ruin the entire consumer credit industry, an absurd result which Congress could not have intended. Carte Blanche's potential liability, however, would not be reduced by prohibiting class action enforcement of the Act; recovery by those injured, whom the Act sought to protect, would merely be made more difficult—a result not in harmony with any expressed Congressional intent. See 1968 U.S.Code, Cong. & Admin. News, pp. 1962–2030. Thus, I would reject Carte Blanche's contention that class action treatment is inconsistent with the Act, and I would affirm the order of the district court.

ALDISERT, Circuit Judge (dissenting).

Much of the majority opinion is committed to defending the principle that a class determination *vel non* may be the subject of the Interlocutory Appeals Act of 1958, 28 U.S.C. § 1292(b). I was not aware that this was being challenged, see Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727, 734 (3d Cir. 1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1190, 28 L. Ed.2d 323 (1971). Rather, the very real § 1292(b) problem exemplified by this appeal is the imperative to set forth with specificity the "controlling question of law as to which there is substantial

ground for difference of opinion. . . ." This court in banc had no assistance from the district court which certified this case for appeal, by the appellant who filed it, and by the panel of this court which permitted it to be lodged. The mere fact that a class action has been ordered is usually the subject of a "substantial ground for difference of opinion," as the majority frankly admits. Yet if every class action grant or denial were certified under § 1292(b) the appellate courts would be swamped by the second-guessing process of class determination which I view predominately sounding in fact, rather than in law. I fail to see an exotic question of law requiring definition or refinement by this court when the sole issue is whether the factual complex of a given case meets the .class action requirements of Rule 23, F.R.Civ.P. Questions of law, not of fact, inhered in Kauffman v. Dreyfus, *supra*, which met the issue whether a plaintiff, not a member of a class, could be a class representative.

If a question of law lurks in this appeal, and I suspect that one can be distilled from appellant's brief, it is an issue restricted to the damage aspects of plaintiff's complaint. Although reversing the class action determination, the court has failed to meet this issue.

Appellant's basic theme, sounded in Ratner v. Chemical Bank New York Trust Co., 54 F.R.D. 412 (S.D.N.Y. 1972), and repeated in some 34 reported and unreported district court opinions chanting the same litany, is that a class action should not lie because in the event the court finds liability, an award of the statutory penalty of $100 for each class member would defeat the purpose of the Truth in Lending Act, 15 U.S.C. § 1601 et seq., and, · moreover, would threaten the solvency of the appellant because the statutory penalty would greatly exceed potential actual damages.

So posited, this case does present a proper appeal on a controlling point of law which the parties briefed and argued, but which today this court does not meet. Chief Judge Seitz met the is-

sue squarely, and I am in total agreement with his treatment and disposition of it. A class action is but the sum of its parts. If a part, one case, may be filed under TILA, and appellant so concedes, there can be no statutory bar to combining all of the parts.

"Because a class action, 'so instinct with benefits, is also wrought with mischievous effect,' it is imperative that participating litigants and the court never lose sight of the laudatory fundamental purposes of this procedural device. Its historical purpose was to alleviate the burden on the court and its facilities in cases where a claim was common to a large number of persons." Greenfield v. Villager Industries, Inc., 483 F.2d 824, 831 (3d Cir. 1973) (footnote omitted).

Another difficulty which arises when the district court, the appellant, and this court fail to identify the precise "controlling question of law" is the possibility of an appellate court decision based on contentions neither briefed nor argued by the parties. Although this difficulty did not arise in Johnson v. Alldredge, 488 F.2d 820 (3d Cir. 1973), I fear this is what has happened here. Distilled to its essence the court's opinion today yields a conclusion that the patent case of Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L. Ed.2d 788 (1971), somehow alters orthodox thinking on Rule 23 interpretations. The court today faults and reverses the district court for not concluding that an individual test case is superior to a class action on the liability phase of this law suit because of the "new" concept of collateral estoppel enunciated by *Blonder-Tongue:* "We think the *Blonder-Tongue* decision requires that a new look be taken at the alternative of a test case in lieu of an early class action determination." (Majority opinion at 760.)

I have extreme difficulty with this. First, the collateral estoppel issue was neither briefed nor argued by the parties, neither before the panel nor before the court in banc. At the very least, the

court should have requested additional briefing or oral argument on this issue.[1] Second, and more important, I question the underlying premises of the majority suggestion that the 1971 *Blonder-Tongue* case makes a jurisprudential contribution to class action litigation in this circuit which was not present at the time of the 1966 class amendments to Rule 23. For sixteen years prior to the adoption of the modern class action rules, the courts in this circuit followed the doctrine of Bruszewski v. United States, 181 F.2d 419 (3d Cir.), cert. denied, 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950).

As to the effect of *Blonder-Tongue* in other circuits in non-patent cases, I am not at all certain that *Blonder-Tongue* has the sweep now attributed to it. The court utilized some extremely cautionary language:

> Undeniably, the court-produced doctrine of mutuality of estoppel is undergoing fundamental change in the common-law tradition. In its pristine formulation, an increasing number of courts have rejected the principle as unsound. Nor is it irrelevant that the abrogation of mutuality has been accompanied by other developments—such as expansion of the definition of "claim" in bar and merger contexts and expansion of the preclusive effects afforded criminal judgments in civil litigation—which enhance the capabilities of the courts to deal with some issues swiftly but fairly.

> Obviously, these mutations in estoppel doctrine are not before us for wholesale approval or rejection. But at the very least they counsel us to re-examine whether mutuality of estoppel is a viable rule where a patentee seeks to relitigate the validity of a patent once a federal court has declared it to be invalid.

402 U.S. at 327, 91 S.Ct. at 1442. (Footnotes omitted.)

Moreover, Sea-Land Services, Inc. v. Gaudet, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), did not accord to *Blonder-Tongue* the inclusiveness attributed by the majority. (At 593, 94 S.Ct. 819.)

In sum, there is no "new look" in this circuit, and it is at least questionable that the *Blonder-Tongue* case mandates a re-tailoring of estoppel law in non-patent cases in those jurisdictions which do not share our *Bruszewski* views.

We have recently said: "Also influencing the general acceptance of class actions has been recognition of the fact that the collective or accumulative technique of this device makes possible an effective assertion of many claims which otherwise would not be enforced, for economic or practical reasons, were it not for the joinder procedure. The 1966 amendments to Rule 23 are a restatement and reinforcement of public policy, mutually expressed by the Judicial Conference of the United States, its advisory committee on Rules of Civil Procedure, the Supreme Court, and the Congress, which candidly facilitate and encourage the use of class actions." Greenfield v. Villager Industries, Inc., *supra*, 483 F.2d at 831. Although the

---

1. A number of arguments and rationalizations have been urged for the general rule that an appellate court will not consider sua sponte a legal argument not presented and urged by the litigants. These might be summarized as follows: (1) the litigants have a right to control the litigation, therefore the court should decide only those questions raised by the parties; (2) no error requiring rectification has been committed by the lower court since the lower court has—by definition—not ruled on the matter if the question is raised for the first time by the appellate court sua sponte; (3) in some cases this last concept has been enlarged into a fundamental, jurisdictional limitation which foreclosed the consideration of a question not raised in the lower court; and finally (4) the losing party has had no opportunity to rebut the argument accepted by the court, which may in fact be erroneous, and the court has received no assistance in deciding the question from the litigants who are well informed in the matter. Vestal, Sua Sponte Consideration in Appellate Review, 27 Ford.L.Rev. 477, 487 (1958–59). (Footnote omitted.)

majority pay lip service to "the underlying assumption that class action disposition of multiple similar claims, especially small consumer claims, is socially desirable," the brute effect of its frontal assault on this policy will debilitate consumer class actions. To suggest that the litigative strength of a lone consumer on one small claim can be any match for the adversary's resources, simply because there is a provision in TILA for payment of attorneys' fees, is to ignore blithely the realities of modern litigative processes. While there is biblical if not historical support for the notion that one David did slay a Goliath, the social desirability of consumer class actions was to insure that a David plaintiff had a Goliath capability against the Goliath propensities of his adversary, and thus the real power of the courtroom adversaries would be equalized. I have a gnawing fear that this court, with a historic tradition of consumer protection, today takes a major step backwards.

Finally, the observation is compelled that the majority, under the guise of the "superiority" finding, have now rewritten the opening mandate of Rule 23(c)(1): *"As soon as practicable after the commencement of an action brought as a class action,* the court shall determine by order whether it is to be so maintained." They would now have it read: *"As soon as practicable after the establishment of liability,* the court shall determine an action brought as a class action." This runs counter to the policy, if not the letter, of the Supreme Court's latest expression of class actions in American Pipe & Construction Co. v. Utah, 414 U.S. 538, 94 S.Ct. 756, 38 L. Ed.2d 713 (1974):

> A recurrent source of abuse under the former . . . [Rule 23] lay in the potential that members of the claimed class could in some situations await developments in the trial or even final judgment on the merits in order to determine whether participation would be favorable to their interests. If the evidence at the trial made their prospective position as actual class members appear weak, or if a judgment precluded the possibility of a favorable determination, such putative members of the class who chose not to intervene or join as parties would not be bound by the judgment. This situation—the potential for so-called "one-way intervention"—aroused considerable criticism upon the ground that it was unfair to allow members of a class to benefit from a favorable judgment without subjecting themselves to the binding effect of an unfavorable one. The 1966 amendments were designed, in part, specifically to mend this perceived defect in the former Rule and to assure that *members of the class would be identified before trial on the merits* and would be bound by all subsequent orders and judgments.[13]

> 13. See Advisory Committee's Note to Proposed Rules of Civil Procedure, 39 F.R.D. 98, 105–106.

(At 547, 94 S.Ct. at 763) (My emphasis). (Footnote omitted.)

Because it was faced with a statute of limitations issue, the Court was meticulous in emphasizing *when* the class action determination should be made:

> Under the present Rule, a determination whether an action shall be maintained as a class action is made by the court "as soon as practicable after the commencement of an action brought as a class action. . . ." Rule 23(c)(1). Once it is determined that the action may be maintained as a class action under subdivision (b)(3), the court is mandated to direct to members of the class "the best notice practicable under the circumstances" advising them that they may be excluded from the class if they so request, that they will be bound by the judgment, whether favorable or not, and that a member who does not request exclusion may enter an appearance in the case. Rule 23(c)(2). Finally, the present Rule provides that in 23(b)(3) actions the judgment shall include all those found

to be members of the class who have received notice and who have not requested exclusion. Rule 23(c)(3). Thus, potential class members retain the option to participate in or withdraw from the class action only until a point in the litigation "as soon as practicable after the commencement" of the action when the suit is allowed to continue as a class and they are sent notice of their inclusion within the confines of the class. Thereafter they are either non-parties to the suit and ineligible to participate in a recovery or be bound by a judgment, or else they are full members who must abide by the final judgment, whether favorable or adverse.

(At 547, 94 S.Ct. at 763) (Footnotes omitted.)

For these reasons, I dissent and would affirm the judgment of the district court.

ADAMS, Circuit Judge (dissenting):

I dissent from the result reached by the majority.

### a.

The threshold question here, of course, is whether the district court's determination that this case may proceed as a class action is subject to interlocutory review under section 1292(b).[1] I agree with the conclusion reached by the other members of the Court that this question is reviewable.

### b.

After settling the issue of appealability, the majority rules that the class action determination of the district court was improper. Having concluded that the district court erred in not giving fuller consideration to the "test case" as an alternative means of adjudication, the better approach, in my judgment, would be for the Court to remand for a new determination by the district court whether the case should proceed as a class action. Rather than doing so, the majority seems to bar the district court from reconsidering whether class action treatment is appropriate at the liability stage of this case. This appears, to me, to be erroneous.

*Blonder-Tongue*, taken together with *Bruszewski*, certainly does require a "new look" at the test case. However, the implications of *Blonder-Tongue* are not so settled as the majority appears to think. For example, even if that decision signals a general demise of the "mutuality" requirement, there is no means by which this Court could, with certainty, predict what res judicata or collateral estoppel effect would be accorded any judgment in favor of Katz.[2] More germane still is the observation that the requirement of mutuality, though possibly moribund, is not yet dead. Both *Blonder-Tongue* and *Bruszewski* though expressing principles wide-ranging in their implications, were cases where mutuality analysis was discarded to permit "defensive" use of collateral estoppel. Yet the other plaintiffs in this case would seek, in the majority's hypothetical instance, to make "offensive" use against Carte Blanche of a judgment in favor of Katz. I am not prepared, at least at this time, to hold that either *Blonder-Tongue* or *Bruszewski* would necessarily permit such a result.

1. That the class action question is reviewable under 1292(b) is made particularly clear by Professor Kaplan, in Continuing Work of the Civil Committee—1966 Amendments to the Federal Rules of Civil Procedure (1), 81 Harv.L.Rev. 356, 390 n. 131 (1967), and by the Report of the ABA Special Committee on Federal Rules of Procedure, 38 F.R.D. 95, 104–05 (1965). The ABA Special Committee stated that, "[W]e should be disturbed, however, if the change in the form of [Rule 23] caused the Courts to determine that there was no 'controlling question of law,' but only questions of 'discretion' not subject to review under Subdivision (b) of Section 1292 of Title 28."

2. "[A] court conducting an action cannot predetermine its res judicata effect . . . . [T]his can be tested only in a subsequent action." C. Wright, Federal Courts, 314 (2d ed. 1970).

Thus, though the unsteady law of *res judicata* and collateral estoppel justifies further consideration of the test case as an alternative to a class action, it is precisely the unsteadiness of that law—a quality fostered, not meliorated, by *Blonder-Tongue*—that prevents me from attaining the majority's certainty that a test case will be "superior." The apparent erosion of the mutuality requirement is an incipient development, not a *fait accompli*, and thus serves as a shaky foundation for an outright reversal of the district court's class determination. Rather, *Blonder-Tongue* generates only one consideration among many to be weighed by the district court.

### c.

In my judgment, too, the Court should take this opportunity to dispose of the appellant's prime contention: that Congress intended to prohibit enforcement of the Truth in Lending Act (the Act) by way of class actions. The other dissenting opinions are correct, I think, in maintaining that the effect of the Act upon the class determination is a problem that may not be circumvented at this stage of the case, especially when this issue has already been briefed and argued.

The Act provides for the recovery, in private actions, of twice the amount of any finance charge that is proved to have been illegally undisclosed.[3] However, the award in such an action may not exceed $1,000, nor amount to less than $100.[4] The Act makes further provision for the award of an attorney's fee to successful plaintiffs, thus creating "a species of 'private attorney general' to participate prominently in enforcement."[5]

The district court did not consider whether Congress intended to forbid class enforcement of the disclosure requirements of the Act. Carte Blanche, of course, argues strenuously that Congress did manifest such an intent. The majority declines to consider the question, apparently on the ground that any opinion on the matter would be rendered advisory should the district court determine that "actual damages" may be recovered, since "there is no suggestion that Congress intended to prohibit the recovery of actual damages in a class action."

This decisional reticence is puzzling. Whether "actual damages" or only the minimum $100 damages are sought, the arguments advanced by Carte Blanche in favor of the absolute preclusion of a class action are, in my judgment, equally pertinent. First, Carte Blanche contends that class enforcement is inconsistent with the section of the Act providing for the recovery of attorney's fees. Second, Carte Blanche maintains that a class recovery under the Act might be so large as to be completely unjust. The impact of each of these arguments is undiminished by the fact that "actual" damages—by which is meant, presumably, something greater than the $100 minimum—may be recoverable in this action.[6] Thus, to guide the district court in its class determination, we should lay to rest all claims that the Act absolutely prohibits, or invariably permits, class enforcement.

There is little support in the legislative history for the proposition that Congress intended to bar all class action enforcement of the Act. True, Senator Moss of Utah, an active proponent of the Truth in Lending legislation, did re-

---

3. 15 U.S.C. § 1640(a)(1).

4. *Id.* A separate award may be recovered, of course, in connection with each consumer credit transaction in which any illegal nondisclosure occurs.

5. Ratner v. Chemical Bank New York Trust Co., 329 F.Supp. 270, 280 (S.D.N.Y.1971).

6. The only damages recoverable in a TILA action are double the plaintiff's *actual* damages, except when actual damages exceed $500 (in which case only $1000 may be recovered) or are less than $50 (in which case $100 may be recovered).

mark at a hearing that "I do not believe class actions are permissible under Truth-in-Lending." [7] Assistant Attorney General (now Judge) McLaren, in direct response to Senator Moss, expressed the contrary opinion. He stated that the private right of action provided in the Act was subject to the Federal Rules of Civil Procedure and so amenable to class action treatment.[8] This scant background offers an inadequate basis for ruling that class enforcement of the Act is absolutely proscribed. Still less does this history warrant the conclusion that class treatment is *always* appropriate. To accept Carte Blanche's contention, therefore, or to accept the converse, "would be a work of clairvoyance and not of construction or interpretation." [9]

Without attempting to conjure up the myriad situations that might occur where class action treatment would be appropriate or inappropriate, it is sufficient to remark that in exercising the "considerable discretion of a pragmatic nature" conferred by the "broad and open ended terms" [10] of Rule 23, a district court should pay close attention to the Act's provisions, and to the potential effect of a class recovery in a Truth in Lending case.

Rule 23(b)(3), under which the class determination in this case was and will

be made, permits the maintenance of a class action if, *inter alia*, a district court:

> "Finds . . . that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." [11]

The majority reverses the district court's finding of "superiority," and orders postponement of the class action determination until the question of liability has been settled. There is, in my view, no basis for such a ruling. The proper course would appear to be to remand, giving the district court the benefit of our views on the appropriate factors to be considered in its "superiority" investigation. This conclusion—that remand, not outright reversal, is called for —proceeds from the "broad and open-ended terms" of Rule 23, and the generous discretion vested thereby in the district court.[12]

Upon such remand or, in any event, when the class action determination is finally made, there are considerations emanating directly from the Truth in Lending Act which should bear upon the district court's inquiry into superiority.

First, it must be noted that the litigative incentive often provided by the class action, through the aggregation of small claims into one large enough to call

---

7. Hearings before the Consumer Subcommittee of the Senate Committee on Commerce on S. 2246, S. 3092, 91st Cong., 1st & 2nd Sess., ser. 91–43, pt. 1, at 27 (1970).

8. *Id.*

9. Wilcox v. Commerce Bank of Kansas City, 474 F.2d 336, 344 (10th Cir. 1973), wherein the court also ruled that there might be class action enforcement of the Act.

10. Ratner v. Chemical Bank New York Trust Co., 54 F.R.D. 412, 416 (S.D.N.Y.1972).

11. Rule 23 states that "matters pertinent" to a finding of superiority include:

> "(A) The interest of members of the class in individually controlling the prosecution or defense of separate actions;
> (B) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

> (C) The desirability or undesirability of concentrating the litigation of the claims in the particular forum;
> (D) The difficulties likely to be encountered in the management of a class action."

12. *Ratner, supra* Note a, 54 F.R.D. at 416. *See also* Frankel, Some Preliminary Observations Concerning Civil Rule 23, 43 F.R.D. 39 (1967); Note, Proposed Rule 23: Class Actions Reclassified 51 Va.L.Rev. 629, 642, 650–60 (1965). Judge Aldisert, dissenting, appears to approach this view when he says "if every class action grant or denial were certified under § 1292(b) the appellate courts would be swamped by the second-guessing process of class determination which I view predominantly sounding in fact, rather than in law."

forth the financing requisite to the institution of suit, is, in this case, furnished by the Act's provision for a "reasonable attorney's fee." The attorney's fee is recoverable by any victorious plaintiff, irrespective of whether he seeks the minimum $100 award or some larger amount. Thus, while it may be conceded that the private class action often serves the useful function of inducing citizens to institute socially beneficial litigations, it certainly appears that this goal has been well-served by the provision in the Act for attorney's fees. Accordingly, the class action is not necessarily "superior" to an individual action, at least insofar as such superiority might derive from the incentive to bring suit.

Second, if this case is allowed to proceed as a class action, the class might include as many as 700,000 or 800,000 members, or the number of Carte Blanche cardholders.[13] Were such a class to be victorious on the merits, the recovery in this action might run as high as $80,000,000, even if only minimum damages were sought by each plaintiff. Such a liability could conceivably bankrupt the defendant, and force it to cease operation. This prospect of a "horrendous, possibly annihilating punishment"[14] for a technical violation of the Act is certainly a relevant consideration in any inquiry into the "superiority" of a class action as a means of enforcing the statute.

These two factors, then—the existence of the attorney fee provision, and the crippling impact of the potential class recovery—should, at the very least, be weighed in the district court's exercise of the discretion conferred by Rule 23. Numerous other courts, in a variety of circumstances, have ruled that Truth in Lending claims may not be pursued as class actions. Such courts have perceived a similar confluence between the provisions of the Act and the considerations specified by Rule 23(b)(3).[15] The very nature of Rule 23 prevents me from saying that the district court must conclude that a class action will not be a "superior" method of adjudicating this controversy.[16] Nonetheless, the effect of the Act is such that a finding of "superiority" would seem unlikely, at least from this vantage.

### d.

As noted by the commentators, Rule 23 confides to the district courts a broad range of discretion and managerial latitude regarding class actions.[17] It is they, rather than the appellate courts, who must provide the creative imagination necessary to make the Rule workable. There are numerous factors, some already considered, some not, which the district court in this case should have the prime responsibility of evaluating: Rule 23(c)(1)'s directive that a class action determination be made as "soon as practicable;" the attorney's fee provision of the Act; the potentially stultifying impact of a class recovery; the alternative of a test case;[18] the possibility that some plaintiffs may be barred by

---

13. This fact—the enormity of the potential class—proceeds from the nature of the business as well as from the structure of the Act, in that a violation thereof can normally be expected to have been committed against all, or a large number, of the credit card holders of a company such as Carte Blanche.

14. *Ratner, supra,* Note 9, 54 F.R.D. at 416.

15. *See, e. g., Ratner, supra* Note 9; Graybeal v. American Savings and Loan Ass'n., 59 F.R.D. 7 (D.D.C.1973); Wilcox v. Commerce Bank of Kansas City, 474 F.2d 336 (10th Cir. 1973). Compare Kristiansen v.

John Mullins & Sons, Inc., 59 F.R.D. 99 (E.D.N.Y.1973).

16. *See* Note 11, *supra,* and accompanying text.

17. *See* Frankel, *supra,* Note 11, 43 F.R.D. at 39.

18. As the Advisory Committee's Note to Rule 23 suggests, "one or more actions agreed to by the parties as test or model actions may be preferred to a class action. . . ." *See also* Eisen v. Carlisle and Jacquelin, 391 F.2d 555, 572 (2d Cir. 1962) (dissenting opinion of Lumbard, C. J.).

the statute of limitations;[19] and other considerations dictated by the express terms of Rule 23.

In short, as previously indicated, the district court, not this Court, is the appropriate forum for the resolution of the question whether this particular case should, at this time, go forward as a class action.

### e.

Thus, I would reverse the decision of the district court and remand for a new class action determination.

19. Though the Supreme Court has stated, in American Pipe and Construction Co. v. Utah, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the action been permitted to continue as a class," there may yet be circumstances under which the statute will bar individual actions. In *American Pipe* certain class members, as to whom the statute was held tolled, had made motions to intervene under Rule 24 after the district court had decided against maintenance as a class action. This circumstance may or may not obtain in this case.